**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

*vs*.                                          **CRIMINAL ACTION NO. 1:06CR14**

**CLEVELAND BILLER,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION RE: MOTION TO SUPPRESS

### I. Procedural History

The Grand Jury returned an indictment against Defendant Cleveland Biller on or about March 7, 2006, charging in Counts One, Two, Three, and Four, that he "did willfully make and subscribe a United States individual income tax return for tax year[s] [1999, 2000, 2001, and 2002, respectively] which w[ere] verified by a written declaration that [they were] made under the penalties of perjury and which he did not believe to be true and correct as to every material matter . . . . in violation of Title 26, U.S.C. § 7206(1)"; and charging in Count Five that he "did corruptly obstruct and impede and endeavored to obstruct and impede the due administration of Title 26 of the United States Code, in a way in which he concealed unreported income in the approximate amount of $1,111,494 by committing these and other overt acts:

1)     On or about October 10, 2000, the defendant mailed a false United States individual income tax return for tax year 1999 declaring zero (-0-) taxable income when in fact his correct taxable income was approximately $196,397.

2)     On March 17, 2001, the defendant wrote a letter to the IRS cancelling his first appointment which had been set by the IRS to discuss an IRS audit of his 1998 tax year.

3) On or about March 27, 2001, the defendant sent a multi-page letter to the IRS indicating, among other things, that the IRS has no jurisdiction over a business trust and demanding that the IRS answer many questions before the defendant will cooperate with any audit of his business trust.

4) On or about June 13, 2001, the defendant cancelled his second appointment which had been set by the IRS to discuss his audit.

5) On or about August 14, 2001, the defendant mailed a false United States individual income tax return for tax year 2000 declaring zero (-0-) taxable income when in fact his correct taxable income was approximately $240,072.

6) On or about March 25, 2002, the defendant cancelled his third appointment which had been set by the IRS to discuss his audit.

7) In or about April of 2002, the defendant mailed a false United States individual income tax return for tax year 2001 declaring $8,164 taxable income when in fact his correct taxable income was approximately $322,221.

8) On or about May 25, 2002, the defendant cancelled his fourth appointment which had been set by the IRS to discuss his audit.

9) On or about July 17, 2002, the defendant sent back information from the IRS with the words, 'Refused for fraud,' stamped over the requests.

10) On or about July 25, 2002, the defendant met personally at the offices of the IRS, and he provided information to the agents indicating that he believed they did not have authority to receive the information they had summonsed.

11) On or about August 7, 2002, the defendant came in to the IRS office and returned a

summons to the IRS office and again questioned the authority of the IRS to request such information.

12) On or about August 9, 2002, the defendant sent a letter to the IRS cancelling his fifth appointment which had been set by the IRS to discuss his audit.

13) On or about September 13, 2002, the defendant mailed more material to the IRS stating, among other things, that citizens of the United States are not liable for income taxes. The defendant also stated, 'We are not and never have been citizens or residents of the geographical United States . . . .'

14) On or about December 18, 2002, the defendant mailed more material to the IRS refusing to produce documents on the basis that such material was '"Refused for Fraud . . . .'

15) On or about January 20, 2003, the defendant responded to a notice of the IRS's intent to levy with a mailing claiming, among other things, '. . . there is no legitimate enforcement power granted to the Internal Revenue Service by Congress.'

16) On or about August 9, 2003, the defendant mailed false United States individual income tax return for tax year 2002 declaring zero (-0-) taxable income when in fact his correct taxable income was approximately $299,282.

17) On or about September 18, 2003, the defendant responded to a tax bill by stating, among other things, that, 'We disagree that Assessment authority rest [sic] in IRC [sic]. In violation of Title 26, United States Code, Section 7212(a)."

## II. Motion to Suppress

On June 21, 2006, Defendant filed his "Motion to Suppress all Evidence Provided by or Flowing from the Law Offices of Gianola, Barnum & Wigal, L.S., and Specifically, James A.

Gianola, Christopher A. Barnum and Gary A. Wigal Individually" [Docket Entry 34]. The case was referred to the undersigned for pre-trial motions on May 11, 2006 [Docket Entry 25].

On the 10th and 11th days of July 2006, came the Defendant, Cleveland Biller, in person and by Robert Alan Jones and Hunter D. Simmons, his counsel, and also came the United States of America by its Assistant United States Attorney, Robert H. McWilliams, Jr., pursuant to the Order setting hearing on referred pre-trial motions [Docket Entry 39].

Thereafter, the undersigned took up Defendant's "Motion to Suppress all Evidence Provided by or Flowing from the Law Offices of Gianola, Barnum & Wigal, L.S., and Specifically, James A. Gianola, Christopher A. Barnum and Gary A. Wigal Individually" [Docket Entry 34]. The undersigned heard the testimony of IRS Supervisory Special Agent (Ret.) Jeffrey Sandy; IRS Special Agent Frank Klepadlo; IRS Special Agent Ryan Korner (Criminal Investigation Division); IRS Special Agent Jason Gandee (Criminal Investigation Division); IRS Special Agent Tamela Devericks; Gary A. Wigal (hereinafter "Wigal"); Christopher A. Barnum (hereinafter "Barnum"); James "Rocky" Gianola (hereinafter "Gianola"); and Defendant. The Court admitted Defense and Government Exhibits into evidence. The undersigned heard argument from counsel for the United States and permitted counsel for Defendant to file supplemental argument in writing on or before Friday, July 14, 2006.

### III. Discussion

### A. The Parties' Contentions

Defendant contends in his "Motion to Suppress all Evidence Provided by or Flowing from the Law Offices of Gianola, Barnum & Wigal, L.S., and Specifically, James A. Gianola, Christopher A. Barnum and Gary A. Wigal Individually" [Docket Entry 34] that:

4

1) "Attorney James A. 'Rocky' Gianola has represented [him] since the early 1980s."

2) "[Defendant] was introduced by Mr. Gianola to Jim Binge, a CPA and representative of the Aegis Trust System."

3) "[Defendant] requested and received paid legal advice from Mr. Gianola as to the legality of the Aegis Business Trust System . . . ."

4) "Mr. Gianola assured [Defendant] that the Aegis Business Trusts were legal."

5) "Relying on the advice of his paid legal counsel, Mr. Gianola, [Defendant] became a client of Aegis and used the business trusts that later became the subject of the indictment."

6) Gianola and his partner, Attorney Wigal, "who has also represented Defendant," participated with IRS Criminal Investigation Division Special Agents.

7) In two interviews, Gianola misrepresented his attorney-client relationship with Defendant and deceived the Special Agents concerning whether he had given relevant legal tax advice to Defendant.

8) Gianola also testified before the Grand Jury and was also interviewed by the Assistant United States Attorney on this case prior to his Grand Jury testimony.

9) Gianola again misrepresented his relationship with Defendant in the interview with the AUSA.

10) Defendant never waived his attorney-client privilege with respect to any representation by the Law Offices of Gianola, Barnum & Wigal or by James "Rocky" Gianola, Gary A. Wigal or Christopher A. Barnum.

11) Gianola's misrepresentations, violations of attorney-client privilege and failure to state that he gave legal advice wrongfully caused Defendant's indictment.

The United States contends:

1) There was no attorney-client relationship between Defendant and Gianola, because Gianola acted only as a closing agent, not as an attorney, and the documents Gianola signed could have been signed by any non-attorney.

2) There was no breach of any attorney-client relationship, even if one existed.

3) Even if there was a breach, the crime-fraud exception allowed the relationship to be breached.

4) Gianola provided no documents or communications from Defendant that the Government intends to use in its case-in-chief.

5) "The only attorney-client communication from Gianola's law firm which would be used is the conversation between Gianola's law partner, Wigal, and Biller, and that would be in rebuttal to an advice of counsel defense."

## B. Issues

Simply stated, the undersigned finds the issues under consideration are:

1) Was there an attorney-client relationship between Defendant Biller and Gianola and /or his law firm?

2) Did that attorney-client relationship extend to Defendant's participation in the Aegis Trusts?

3) For purposes of the suppression motion only, did Gianola misrepresent to the IRS agents and the AUSA that he did not represent Defendant regarding the trust accounts?

4) Must Gianola's and/or his law firm's communications and production of evidence to the IRS and the United States Attorney regarding Defendant be suppressed?

5) Must all evidence "flowing from" evidence provided by the law firm regarding Defendant

be suppressed?

6) What, if any, is the significance of the United States' assertion that it will not use any of the evidence provided by Gianola or his law firm in its case-in-chief?

## C. Burden of Proof at Suppression Hearings

"[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." United States v. Matlock, 415 U.S. 164, 178 n. 14, 94 S.T. 988, 996, n. 14, 39 L.Ed.2d 243 (1974). Accordingly, all facts stated herein have been found by the undersigned from a totality of the evidence presented during the hearing of July 10 and 11, 2006, using the preponderance of evidence standard.

## D. Attorney-Client Privilege

**1. Generally**

The attorney-client privilege is "the oldest of the privileges of confidential communications known to the common law . . . [i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. Upjohn Co. V. United States, 449 U.S. 383, 389, S.Ct. 677, 66 L.Ed.2d 584 (1981).

The Fourth Circuit holds:

When the attorney-client privilege applies, "it affords confidential communications between lawyer and client complete protection from disclosure." Hawkins v. Stables, 148 F.3d 379 (4th Cir. 1998). However, because this privilege "impedes the full and free discovery of the truth," it must be "narrowly construed and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." Id. (internal quotation marks, citations & alterations omitted).

This court has adopted the "classic test" for determining the existence of an attorney-client privilege:

7

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. United States v. Jones, 696 F.2d 1069, 1072 (4th Cir.1982) (per curiam) (internal quotation marks omitted) . . . . "The burden is on the proponent of the attorney-client privilege to demonstrate its applicability. The proponent must establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." Id. (citations omitted).

In re Grand Jury Subpoena, 341 F.3d 331 (4th Cir. 2003).

Cleveland Biller (hereinafter "Biller"), a graduate mechanical engineer, worked for the United States Forest Service for 26 years before retiring in 1990 to attend to the engineering company he started in 1980 and his accumulated real-estate holdings (approximately thirty properties).

In the early 1990's, Biller became socially associated with Gianola, a Morgantown, West Virginia lawyer of the legal corporation of Gianola, Barnum and Wigal, L.C. Gianola, after receiving an undergraduate degree in accounting, graduated from WVU College of Law and was admitted to the West Virginia Bar in 1982. Thereafter, he limited his legal practice primarily to commercial and personal injury litigation matters.

Gianola's professional association with Biller commenced with representation in an Environmental Protection Agency matter which arose out of Biller's acquisition of the Beaumont Glass Plant and alleged ground contamination from heavy metals. That representation continues to the present day. Gianola characterized Biller as "a regular client" of his firm. (Government

8

Exhibit 11, p. 14).

In the early to middle 1990's, Biller became concerned with protecting his assets from liability claims and the high costs of liability insurance for such protection. He discussed his concerns with Gianola. Gianola had become socially acquainted with Booker Walton (hereinafter "Walton")and, through that relationship, met James Binge (hereinafter "Binge"). Gianola learned that Walton had an asset protection plan and told Biller he knew someone who could help him.

Gianola had first met Walton "socially from community basketball and softball leagues and things." (Government Exhibit 11, p. 5). Walton asked Gianola to meet with him to discuss "an engagement that he had with a company out of Chicago by the name of Athens Group or Aegis." (Government Exhibit 11, p. 5). Later he dealt with Walton as a source of referral of clients for the preparation of wills. Gianola reported to IRS Special Agents Devericks and Korner during his April 20, 2003, interview that, in early 1995, Walton asked him to determine if business trusts were legal in West Virginia. (See also Government Exhibit 11, p. 6). Gianola told the special agents that he researched the matter and determined business trusts were legal and their main purpose was asset protection. (See also Government Exhibit 11, p. 7). They were also useful to protect assets from lawsuits. By transferring cash or real-estate offshore, those assets were less susceptible to being taken through legal actions because of the extremely short statute of limitations of some offshore countries. (Defendant's Exhibit 2).

Gianola introduced Biller to accountant, Binge. Biller met with Binge in the conference room of the Gianola law firm. However, Gianola was not present during the meeting. During this meeting, Biller and Binge discussed off-shore trusts which would offer protection of Biller's assets from lawsuits. Biller was told by Binge that he would have to pay taxes on money or assets placed

9

in the off-shore trusts "sooner or later," but, at least, when the money or assets were withdrawn from the trusts. He was also told that the likelihood of anyone being able to successfully sue and recover against his assets was remote because the assets were held in the trust in the island country of Belize and its law required any such lawsuit be instituted in Belize within twenty-four hours of the alleged liability incident giving rise to the claim, and "that was impossible."

Although disputed by Gianola[1], following the meeting with Binge, Biller asked Gianola if the Common Law Business Organizations (CBP's) (off-shore trusts being offered by Walton and Binge) were legal, asserting he did not want trouble with the IRS. Gianola advised Biller he researched the trusts and could find nothing wrong with them and assured Biller they were legal.

On July 23, 1996, Gianola billed Biller for a January 11, 1996, meeting with respect to Biller's December 31, 1995, tax information; a January 29, 1996, review of the 1995 tax return and estimated tax liability for December 31, 1995; a January 30, 1996, meeting regarding "S" election and built-in capital gain; June 5, 1996, research regarding private foundation and self dealing prohibition and review of application and support documentation and review of trust agreement. (Defendant's Exhibit 5).

Biller received and executed documents creating the trusts and transferring his assets in to the trusts. Although disputed by Gianola, Barnum and Wigal as to what documents their firm prepared, it is undisputed that Gianola acted as a straw party in the transfer of the assets in to the trusts. Gianola would have his representation of Biller limited to his role as straw party.

---

[1]Gianola admits he was asked by Walton if Business Trusts were lawful in West Virginia and that he did research the issue and advised Walton that Business Trusts were lawful. Gianola denies giving Biller or Walton any advice relative to the legality of off-shore trusts or relative to the Aegis type trusts.

(Defendant's Exhibit 3).  It is undisputed that Gianola did review the first packet of trust documents and, thereafter, signed the trust documents for each participant.  He would receive the documents, sign them and collect his $750.00 fee.  (Defendant's Exhibit 3).

However, a letter, prepared and made a part of the trust document package and introduced in evidence, states: "In a personal meeting Cleveland J. Biller and Eleanor K. Biller retain my services in the preparation of a Common Law Business Organization" and "You may refer to my office at any time in the future for advise and counsel.  And I will make myself available to your local counsel should a need for a conference arise." (Defendants Exhibit 7).  Gianola denies preparation of the document and further claims he removed it from the trust document package before execution by Biller.  Biller admits not seeing or signing this document.  In addition, at about the same time, Gianola admits having prepared letters on his firm's letterhead addressed to other trust participants in which he states: "The documents involved in the creation of your contractual business organization have been prepared by the AEGIS Company in accordance with **our current interpretation of case law and application of the United States Constitution to specific contractual rights.**  The documents are based upon **our interpretation as of the date of execution and upon our research and experience relating thereto."**  "As such, we believe the documentation to be accurate based upon **our interpretation at this time**." The letter encourages the recipient to obtain the opinion of a personal legal counsel and tax advisor regarding the application of the documents set forth in the CBO and calls for the signature of the recipient acknowledging such consultation. (Defendant's Exhibit 7).  Gianola admits to Exhibit 7 having been sent to Harned and another trust participants, but states doing so was a mistake and that the mistake was corrected and the corrected letter was sent to later trust participants including Biller.

11

(See also (See also Government Exhibit 11, p. 18-19). Biller denies signing or seeing a letter such as Exhibit 7 addressed to him. In addition, he asserts he would not have signed such a letter as he considered Gianola as his attorney.

Attorney Barnum of Gianola, Barnum and Wigal, L.C., billed Biller for an updated title and recording of documents in Philippi, West Virginia, and a conference with Biller regarding Common Law Business Organizations" (CBO's) on August 18, 1997. (Defendant's Exhibit 4). Gianola looked at Biller's tax returns for 1996 and 1997, but not thereafter. Biller admits Barnum did not give him tax advice.

## 2. Attorney-Client Privilege Regarding the Trust Accounts

The attorney-client privilege exists for the benefit of the client and therefor the client holds the privilege. In Re: Grand Jury Proceedings # 5, 401 F.3d 247, 250 (4th Cir. 2004).

It is also a relationship that is created and which exists in accord with the law of the state in which the relationship is created and exists. "The relationship of attorney and client is a matter of contract, expressed or implied." State ex rel. DeFrances v. Bedell, 191 W.Va. 513, 446 S.E.2d 906, 910 (1994). "As soon as the client has expressed a desire to employ an attorney, and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the sugject of the employment will be goverended by the rules applicable to such relation. Keenan v. Scott, 64 W.Va. 137, 61 S.E. 806 (1908). "The attorney-client relationship can exist without an agreement for compensation." State ex rel. DeFrances v. Bedell, *supra* at 910. Weimer-Godwin v. Board of Educ. of Upshur County, 179 W.Va. 423, 429, 369 S.E.2d 726, 732 (1988). "All that is required is the existence of a relationship of attorney and client, a status which can exist without

an agreement for compensation." "[A]n attorney-client reletionship may be implied from the conduct of the parties" and "depends on each case's specific facts and circumstances." State ex rel. DeFrances v. Bedell, *supra* at 910. (internal citations omitted).

Based on the foregoing findings of facts from the evidence presented during the hearing of July 10-11, 2006 and applying the law of West Virginia to those facts, Gianola and his firm became the attorneys for Biller in relation to the trusts in question as well as other unrelated matters.

The evidence is uncontradicted that Biller did not give Gianola permission to meet and discuss matters relative to him with the special agents of the IRS; did not waive his attorney-client privilege; did not execute any disclaimer of representation relative to tax advise; and did not execute any document that he would use an attorney other than Gianola with respect to the trust matters. Other than in the acquisition of the Beaumont Glass Plant property, it is undisputed that Biller had not used any attorney outside of the Gianola firm preceding the IRS investigation. It is also undisputed that Gianola did not tell Biller and Biller was not aware that: 1) Gianola and Wigal met with IRS special agents and discussed Biller's legal business with their firm on December 19, 2002, April 20, 2003, and June 7, 2006, 2) Gianola appeared before a grand jury and gave testimony concerning Biller; and 3) Gianola presented documents relating to Biller's legal business with his firm to the IRS and grand jury.

Accordingly, the undersigned concludes that all of the Jones, *supra*, elements have been met and that Gianola and the members of his firm were the lawyers for Biller in the creation of the trust, which is in part at issue in the within criminal litigation.

The Government asserts that if Gianola and Biller had an attorney-client relationship, there was no violation of the privilege by Gianola providing information to IRS special agents or to the

grand jury because any such privileged communications fall within the crime-fraud exception. "The party asserting crime-fraud exception to fact work product or attorney-client privilege must make prima facie showing that privileged communications fall within exception via showing that: (1) client was engaged in or planning criminal or fraudulent scheme when he sought advice of counsel to further scheme, and (2) documents containing privileged materials bear close relationship to client's existing or future scheme to commit crime or fraud." "Prong one of this test is satisfied by a prima facie showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." "Prong two may be satisfied with a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity." In Re: Grand Jury Proceedings # 5, 401 F.3d 247, 251 (4th Cir. 2004). "When applying the crime-fraud exception to the attorney-client privilege, we have held that it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege. Therefore, for the exception to apply, the attorney need not be aware of the illegality involved. Rather, 'it is enough that the communication furthered, or was intended by the client to further, that illegality.'" *Id.* (internal citations omitted).

In the instant case, at the motion hearing stage, the Government failed to make a prima facie showing that some violation was ongoing or about to be committed. The evidence before the undersigned is unrebutted that Biller was introduced to Binge and Walton by Gianola to explore asset protection. Gianola did not testify that he thought the trusts were unlawful. To the contrary, Gianola and Wigal testified that business trusts in West Virginia were lawful and that they told Biller the business trust was lawful. The unrebutted evidence is that Biller asked both Gianola and Wigal to look at the lawfulness of the trusts because he did not want to have any problems or trouble

with the IRS. In short, there is nothing before the undersigned that shows Biller sought advice to promote or shield ongoing or planned criminal activity. In the absence of some evidence suggesting that a violation was ongoing or about to be committed, the crime-fraud exception waiver is not applicable

The undersigned further concludes Biller did not and has not otherwise waived the attorney-client privilege such as to permit or authorize Gianola to disclose information with respect to Biller to the IRS special agents or appear before the grand jury and give sworn testimony relative to Biller or provide documentation from the law firm files pertaining to Biller.

### **E. Gianola's Misrepresentation of Attorney-Client Relationship to Government Officials**

It is undisputed that Gianola told the IRS special investigators and later testified before the grand jury that he did not represent Biller with respect to the Aegis Trusts. Gianola maintained that position during the hearing of July 10-11, 2006. While the undersigned has determined Gianola was Biller's attorney for the trusts, heI cannot say that Gianola did not have an honest, albeit mistaken, belief that he was not Biller's attorney.

Gianola expressed to the government's agents his opinion that he was nothing but a straw party and that he was not Biller's attorney with respect to the Aegis Trusts. The government agents, therefore, had no reason to further inquire of Gianola relative to any attorney client relationship with Biller. As discussed below, this significantly and adversely impacts Biller's motion to suppress.

### **F. Suppression of Evidence Directly Received from Gianola and His Law Firm**

Biller's counsel concedes "[t]here does not appear any existing case law in the Fourth Circuit with respect to investigation of and sanctioning of attorneys and prosecutors for violating the attorney-client privilege prior to trial . . . ." (Docket Entry 64 p. 6). The undersigned was not able

15

to locate any case law which dealt with suppression when the government agents were not aware of the existence of an attorney-client relationship at the time of their questioning of an attorney.

First, there is no evidence to support any finding that the Gianola-Biller attorney-client relationship was ever a Sixth Amendment Constitutionally[2] protected relationship. No evidence has been offered that Biller requested representation of Gianola for criminal or criminally-related matters. At best, the evidence supports the conclusion reached that Gianola was Biller's civil attorney for a number of matters, including the creation of the suspect trusts.

Second, in spite of the arguments made by Defendant's counsel at the July 10-11, 2006, hearing and in his Post Hearing Brief In Support Of Motion To Suppress (Docket Entry 64 p. 7), no motion to dismiss is pending, and the undersigned will not construe the pending motion beyond what it is: a motion to suppress.

Absent precedent, this appears to be a case of first impression. Inasmuch as Biller seeks to exclude evidence obtained by government agents on inquiry of Gianola, the undersigned will look to the underpinnings of the exclusionary rule for guidance.

The "[e]xclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." "Suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." "Even assuming that exclusionary rule effectively

---

[2]The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law; and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for defense."

deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." United States v. Leon, 468 U.S. 897, 922 - 926 (1984).

In the instant case, there is no evidence to support a conclusion that the agents knew or should have known that Gianola was the attorney for Biller with respect to the Aegis Trusts. To the contrary, Gianola disclaimed he was anything more than a straw party. He pointed to written disclaimers in the trust packages to support his assertions that he was not an attorney representing clients, including Biller, in the creation of the trusts or with respect to the tax implications of the trusts.

Absent such knowledge or basis of knowledge on the part of the government agents at the time of their inquiry, there is no wrongful police conduct that requires punishment by suppression. The government agents are free to "conduct objectively reasonable law enforcement activity." Inquiry of a person who happens to be an attorney (Gianola) who has represented an individual (Biller) in matters other than the subject of the police investigation, is an "objectively reasonable law enforcement activity" which should not be deterred by the threat of suppression.

### G. Suppression of Evidence "Flowing From" the Evidence Received from Gianola and His Law Firm

Biller asserts he is entitled to Kastigar like protections. For the reasons hereinafter stated, the undersigned concludes Kastigar is not applicable to this case.

If the IRS special agents who interviewed Gianola had been aware he had an attorney-client relationship with Biller concerning the trusts, then any communications between Biller and Gianola

17

relative to the trusts that were confidential may have been protected from compelled disclosure.

First, there is no evidence to suggest that the IRS special agents **compelled** any disclosure by Gianola of any confidential communications he had with Biller. The agents approached Gianola in his offices and asked him questions on three different occasions: December 19, 2002; April 20, 2003; and June 7, 2006. (Government Exhibits 1, 2 and 3).

Second, "a Kastigar analysis is not triggered by the existence of evidence protected by a privilege, but instead by the government's effort to compel a witness to testify over the witness's claim of privilege." United States v. Squillacote, 221 F.3d 542, 559 (4th Cir. 2000). Kastigar "particularly emphasized the critical importance of protection against a future prosecution based on knowledge and sources of information obtained from the **compelled testimony**." United States v. Hubbell, 520 U.S. 27 (2000) (emphasis added). "[B]ecause the governments right to compel testimony in the face of a claim of privilege is the issue at the heart of Kastigar, its protections do not apply in cases where there is privileged evidence, but no compelled testimony." United States v. Squillacote, *supra* at 560.

Third, "because '[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence,' and any such privilege 'must be strictly construed'" suppression of evidence in the instant case is improper. United States v. Squillacote, *supra* at 560. As previously noted, the attorney-client privilege the undersigned finds to have existed between Gianola and Biller is a common law testimonial or evidentiary privilege, not a Constitutional privilege. Because the privilege at issue is not a Constitutional one, the undersigned refuses to suppress any evidence arguable derived from the government's inquiries of Gianola.

18

## H. The Government's Assertion that It will not use any of the Evidence Received from Gianola or His Law Firm

Notwithstanding Biller's having filed his supplemental memorandum in support of his motion to suppress, the undersigned is still at a loss to ascertain what direct and derivative evidence obtained by the Government from Gianola, which was not already known by the Government or was not part of the public record, Biller seeks to suppress. Biller has failed to meet his burden of proof.

The Government argues that it does not intend to offer in its case in chief any of the suspect evidence it may have obtained through Gianola directly or indirectly that was not already known or already a part of the public record.

The Government's argument does not need to be addressed because the issue has been fully decided on other grounds.

## RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's "Motion to Suppress all Evidence Provided by or Flowing from the Law Offices of Gianola, Barnum & Wigal, L.S., and Specifically, James A. Gianola, Christopher A. Barnum and Gary A. Wigal Individually" [Docket Entry 34] be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed

findings and 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The United States Clerk for the Northern District of West Virginia is directed to provide a copy of this order to all counsel of record.

DATED: July 18, 2006.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE